Let's turn to No. 2, 25-1211 Joyner v. Frontier Airlines. Mr. Ward for the appellant. Good morning, and may it please the Court. Christopher Ward on behalf of Appellants, Menzies Aviation and Frontier Airlines. My hope is to have about three minutes for rebuttal. We'll see how that goes. Your Honors, I submit that the most significant question for this Court to resolve it is not whether to reverse, but what to do with the order to reverse, considering the degree of error that the District Court committed here in its misapplication of the Saxon framework, and it's fair to follow that analysis. Now, the District Court explicitly indicated that it was going to look at that first step by focusing on the plaintiffs, and that's in fact what it did, and that's what it did in the order, and that's legal error, right? And to date, the District Court is, as far as I can tell, the only court that has done Saxon's first step analysis in this way, and equally erroneous was the District Court's decision to find that these plaintiffs, and you look at the order, he refers regularly to these plaintiffs as opposed to the class of workers, but it was erroneous to find that these plaintiffs are transportation workers without any consideration for how frequently they are performing what might be qualifying as transportation worker duties. Instead, the District Court to these concepts of gatekeeping and overseeing and being enmeshed in a much larger transportation system, and that's how the District Court found Saxon's second step satisfied. Your Honor, please. How do you deal with Brock versus the Brock case? Because in Brock, as I understand it, the last leg driver never transported anything in interstate commerce, and we still concluded as a matter of law that they were transportation workers. Correct, Your Honor, and quite frankly, I don't think the Brock case is on point in this. We're not arguing the interstate-intrastate dichotomy in this case, and that's really what Brock boils down to. In Brock, the class of workers analysis, which is the first step of the Saxon analysis, wasn't in dispute. How the District Court and how this court defined the class of workers clearly focused on the actual class, and our point here is the District Court didn't focus on the class of workers. It focused on the plaintiffs. Well, let's say we conducted a review, and we say, well, the last leg drivers in Brock were part of a single, uninterrupted chain of events that resulted in the transportation of goods interstate. Those drivers didn't necessarily transport anything interstate, much like the CSA workers. Let's say the ticket agents hypothetically may not have actually transported goods or even held goods, but that they were part, the argument would be, that Menzies and Frontier make is that they would, in essence, be part of that single, unbroken chain, much like the last leg drivers in Brock. That's my question. I understand the question, Your Honor, and I think there's two distinctions there. One is, again, in Brock, the class of workers were, in fact, transporting things. There's no dispute that they were actually the ones transporting the goods, and the question at that court and what's before the Supreme Court right now is, what does it mean to be sort of the last mile transporter? Is that sufficient? Again, the District Court here didn't find that they were transporting goods. What the District Court found here was that they were enmeshed in a transportation system. They were gatekeepers to passengers transporting their own goods. They were overseeing other people doing the actual transportation, and if you read Circuit City, Saxon, and Bissonnette together, you get a very clear statement of what a transportation worker is in my view. Circuit City says this is a narrow exemption. Saxon says, here's how you resolve it. You define the class of workers. Once you know what that class of workers is, and again, you focus on the class, not the plaintiffs. You focus on the class, and once you've done those things, then you decide are they engaged in interstate transportation or not, and Bissonnette says it's not an industry-based analysis. It is what do the class of workers themselves do, and I submit to the court here that the District Court saying this class of workers are, in fact, these plaintiffs because that's what the District Court did. They don't transport anything. They lift. They weigh. They help passengers, but primarily their job is customer service, and they work with an infrastructure where conveyors can transport the baggage or passengers transport the baggage. Aren't these plaintiffs, though, exemplary of the work that all customer service agents do? I mean, maybe the District Court erred by focusing on the plaintiffs, but the work they do is work that is generally done by every employee that is up at the ticket counters, right? In respect, Your Honor, I disagree. You know, the District Court flat-out told us during the evidence you're hearing it wasn't interested in evidence about the other workers, and this is on, you know, volume two of the record, pages 425. We have the Menzies' job description, right? I mean, doesn't that tell most of the story? And then I guess I would say, yes, the job description is useful, and you've got a number of cases we cite in our brief that say job descriptions are useful, but the inquiry needs to go beyond that because job descriptions are intentionally sort of vague, and, you know, you don't know for sure what every single person is going to do, and so we attempted to introduce evidence, and there is evidence in the record. There's objective evidence in the record, video footage of CSAs never touching a bag, right? There is objective evidence in the record that shows what they are actually doing, and then we did submit the testimony of somebody who trains these workers. Tricia Moreno testified at the hearing, and she trains this classification of workers. She supervises this classification of workers, and she testified that what the plaintiffs said about their job is incredibly hyperbolic, and if you read my cross-examination of the plaintiffs, they went from exaggerating how much they were working with baggage from, this is all we do, it's 100 percent of every shift every day, and I said, no, no, let's get granular. I want numbers, and you read their cross-examination, and all day, every day, finally became something like, it's a handful of passengers out of every hour, and I see at least 100 passengers every hour. Mr. Ward, is it the defendant's position that if the evidence were that these customer service agents seldom or never touch the bags, is it your position is that they have to at least touch the bags and move them to be a transportation worker? I think that's an easy way to understand the Saxon analysis. I don't know that that is exactly how a court would apply Saxon. No, I'm asking the position of the defendants. Our position in this case, your honor, based on this record, is that... I'm asking a hypothetical. Sure. I don't... That is, do you say they have to handle, touch the bags regularly? The answer is no, your honor. That is not our position. Our position is they have to transport them, and I understand that maybe... You have a CSA agent. Let's take the ones at the carousel or that are dealing firsthand with the flyer. Is that enough that they tell them what to do? Here's how you tag your bag. You know, you need to lift it up and sit it there. Here's your boarding pass. Is that insufficient as a matter of law, in your view, to be a transportation worker? Yes, it is, your honor. That is our position. What do you do with the view in Saxon that said, and this is a quote, that they have a role in the flow of goods? Don't they have a role in the flow of goods, even if they generally don't touch the bags? In Saxon, the role that those... I'm talking about Saxon talking broadly in its statement that it's a question of what role they had in the flow of goods. And I think it is important to look at Saxon as a whole because the role in that case was ramp agent supervisors who spent a sufficient amount of their working time actually taking baggage and loading it onto an aircraft. And then if you look at the footnote in Saxon where they say, we're not deciding the question about whether supervisors are transportation workers, but we acknowledge even that one step of removal. I am watching you do your job. That may be a different question. And so I think if you look at Saxon just at that level and you apply circuit city to it, which says this is a narrow exemption, a transportation worker has to actually transport the goods in some meaningful fashion. So you're saying they have to actually touch them on a regular basis? Not necessarily touch them because I could give you the exemption of a truck driver who did not load the goods, but transported them across state lines. I would say that person is transporting the goods, notwithstanding the fact that they did not actually load them onto the truck. But they are still, in fact, directly transporting things. Would the workers that loaded the cargo on the truck be entitled to the exemption? I think that that is the ramp agent case, Your Honor. That's the Saxon case. Right. And well, are you saying that there's a frequency? I think it's a variation of what we've been discussing. Is there a frequency component to the Saxon step? There absolutely is. It's written into Saxon. Well, it was written into Saxon because it was undisputed that the ramp loaders frequently loaded goods onto and off of the plane. So it was certainly sufficient. And so, as you pointed out, it would be a more difficult case in Saxon if it weren't the case. But how could you say that this is an undisputed fact in Saxon and therefore it becomes, I mean, it's illogical to say that that is a requirement in every case just because that happened to be the undisputed fact in Saxon? Agreed, Your Honor. But that is the word Saxon used. And there are multiple courts that have taken Saxon's language and applied a frequency analysis. Other than Fraga 1? Fraga is one. There's multiple district courts that we've cited about it as well. They're in our briefing. Actually, there's one that neither party cited that I came across as we were preparing for. It's the Wilson v. Get It Now case. It's 2025 Westlaw 230-4686. It's a District of Minnesota case from August of last year. I just realized this morning that's actually the same firm representing the plaintiffs here. We're representing the plaintiffs in that case. And I think the district court's analysis in that case is very fulsome. It looks at the class of It looks at the frequency analysis. It looks at the burden of proof. It ultimately decides a district manager in that case who essentially says, I control the transportation process. The district court, Sarah, said that's not transportation if you control it. What if it's, let's say, the year, 25 years from now, and the CSA doesn't load, you know, do anything with the luggage other than put it on the conveyor belt? And then the CSA operates the conveyor belt and says, take that conveyor belt, this long conveyor belt, from Denver to Oklahoma City. There's no planes involved. They don't touch the bags. Are those CSA's transportation workers? I submit that they are not, Your Honor. They're not transporting the baggage. The machinery is. They're operating the machinery. They're saying, hit the button, go. How far would that go, then, Your Honor, is my question. Well, okay. I mean, I guess we could both ask each other hypotheticals. But my hypothetical is, isn't that the problem with your argument, is that in response to Judge Murphy, whether or not they touch the bags, they, 100% of the time, at least those ticket agents, are operating that conveyor belt. And whether or not they're physically touching the bags, it's hitting the button to that conveyor belt that allows that bag to somehow end up on that plane. And I appreciate the hypothetical. My position is, no, they're not transportation workers. And it's not just me saying. They touch the bag as opposed to moving the bag through machinery? Because Circuit City says this is narrow. Saxon outlines for us how we apply this. And then Beeson, it says, this is very focused, and we need to avoid industry. And I think that's part of the argument that the District Court applied here is by saying, they're enmeshed in the process. They're gatekeepers of other passengers doing it, not themselves. Other passengers doing it. They are overseeing what other people do. On some level, everybody who works in this industry is a gatekeeper. Everybody who works in this industry, in some fashion or other, is overseeing the process. But this is a narrow exemption. And the Supreme Court has told us it is not based on what the employer does. It's based on what the class of workers does. And what the class of workers does here is customer service. I will give you some rebuttal time. But why isn't the fact that at least some of the CSAs move bags from the customer to the conveyor belt, why isn't that close enough to what the ramp people did in Saxon to entitle them to really the same analysis? And I think that goes back to the frequency question, Your Honors. OK. Occasionally. And the record is clear on this. Occasionally, these CSAs will assist a passenger. If they're not physically strong enough to move the bags, they will do it. But that is why I went to great lengths during the hearing to develop, all right, how often are you doing that? Right? Because it matters. It matters under the Saxon analysis. And again, the plaintiffs were very hyperbolic in their testimony. But they were very imprecise. And I forced them to get precise. And when they got precise with numbers and time, it became far less than, you know, the Fraga cases used a 25%. We're talking about 2% to 3% of their time they're doing this stuff. And so if you apply frequency there, that's why it's not sufficient. All right. Thank you. Of course. I'm sorry to ask you this question, but I am really curious about it. You probably sat in on the last argument, and we have a fire chief. And let's say the fire chief is on the job for five years, and there has never been a fire in his or her community. Is putting out fires an integral part of the fire chief's responsibilities, even though he has never put out a fire analogously to the CSA agents that hypothetically have never touched a bag? I agree with you, Your Honor. That is part of the job. But Saxon tells us to look at what the class of workers actually does, not what they are hypothetically engaged to do, but what they actually do. Then why is putting out fires an integral part of the fire chief's responsibility if he's never put out a fire? Because, I mean, I'm getting sort of far afield of my own hypotheticals here, Your Honor. But that is the nature of the job, is to be available in that way. When needed. When needed. And so if somebody comes in with a 90-pound bag, let's say at the gate, and maybe that just never happens, but that's why the agent is at the gate to make sure that someone doesn't take on extra large baggage, even if it never happens, right? I would agree, Your Honor. And that's why the frequency analysis matters again. If 50 percent of their time they're doing this, then Saxon says that's a transportation worker. And the ramp agent in that case was a supervisor. I think the evidence was at least two to three days of their five-day week, they were loading bags, right? That's not what the record evidence is here. And that's why the frequency analysis, which the district court didn't conduct, even though this was a clearly disputed issue, that's why I think this is error there. And it matters. Really important to this case. Thank you for the questions, Your Honor. Thank you, counsel. Ms. Wood? Good morning. I'm Shelby Woods, counsel for Appalese, and may it please the court. Three points demonstrate why the district court correctly found that CSAs are transportation workers exempt from mandatory arbitration. First is the standard of review. Now, the district court held a full evidentiary hearing. Appellants are unhappy with the findings made as a result of the evidence they chose to  Rather than presenting evidence on the actual work that either the ticketing and check-in CSAs perform or the gate CSAs perform, they tried to present evidence of expectations, of training, of system design, intention. Are you saying that evidence was irrelevant and should not have been received? No, Your Honor. What I'm saying is it is only relevant to the extent they can establish that those expectations, that supervision, that that design actually coincides with the actual work performed. That is the first step of the Saxon analysis. I thought they tried to put on evidence of actual frequency, and it was either rejected or not considered in the opinion. Am I correct? No, Your Honor. Two points there. They did not attempt to put on evidence of actual frequency, but tried to make the conclusion of frequency based on those expectations, based on those sort of more abstract arguments of what they claim the system was intended to, how it was intended to work, if everything worked perfectly. So you're telling me if I go to the record, there is no evidence whatsoever as to the frequency of the handling of bags by CSAs generally? There is evidence of how CSAs purportedly handle certainly luggage, cargo, and also passengers. There's actually an extensive examination on that. And the only part I think that is taken out of context by appellants that Judge Cruz did say was when appellants were trying to present evidence, actually right after, I believe, appellants had said, you can't look just at the job descriptions here. Yes, the job descriptions say that CSAs are expected to frequently lift cargo up to 70 pounds. You can't just look at that. That's looking at every scenario. You have to look at everything in context. So are you telling me there is evidence of the frequency generally of this class of CSAs at the carousel and at the gate? Yes, Your Honor. There is evidence of frequency where if the court wants to make a ruling just simply on the fact that someone physically lifting, physically manipulating, hauling, pulling, pushing, all of those things that actually result in conveying the cargo to the next point in the stream of commerce, it can make a finding just simply on that and not actually consider whether these other instances of maintaining control, maybe through verbal instruction, through visual control, whether those would be independently sufficient to find that these are transportation workers. But even just giving credit to this argument that the finding of fact of frequency in Saxon, that that actually creates some kind of implied test where courts are required to at least consider some type of quantifiable frequency, which I think is assistive certainly in determining whether we have transportation workers. Focusing on the actual activities of these three plaintiffs, was Mr. Ward correct in his characterization that when he was examining them, is it suddenly the frequency with which they put bags on the carousel significantly diminished? No, Your Honor, because that... So he did not properly characterize the answers on his examination? I do not believe that it would be accurate to say certainly that there was a contradiction as far as the frequency that would cause the court to legitimately believe that there was a credibility issue there. My question is, Mr. Ward said that upon his examination that their testimony indicated in actuality it was not very frequently that they actually handled the bags physically. Is that incorrect, what he said? That is incorrect, Your Honor, and thank you for restating that. I do understand what you're asking. He attempted to extensively cross-examine all three plaintiffs and try to create some inconsistencies and that actually shows the limitations of a really specific strict frequency analysis because these are roles that are just so intimately involved with transportation that it's so enmeshed that it becomes an exercise of really futility where you almost start distorting little aspects of the job and start to lose the big picture of we're dealing with workers who, if you imagine the ticketing the gate desks at a major international airport like Denver International Airport is just completely empty, transportation does not happen anymore. There aren't passengers getting through. There aren't passengers with their luggage getting through. To say that this is all something like... Say that again because I didn't really follow that. I mean, yeah, explain that. So certainly, Your Honor, this is all the big picture context for whether these are a class of workers that would be considered subject to Section 1's exemption such that they should not be tied up in the FAA if there were to be a dispute that, for instance, would cause all CSAs to just simply walk out of the job. If that happened, would that result in a direct impact to international or interstate transportation? And here, it absolutely would. Wait a minute. You're confusing me too. I thought what we look at is the actual evidence of the frequency with which CSAs physically handle baggage. Isn't that what we're looking at? We absolutely do, Your Honor. We're not worried about, well, if they get fired or they get... I completely agree with you. Really just envisioning what the overall role of this class of workers is to the transportation system is just a cross-check that you do when you're actually evaluating what the actual work is that's being performed. Because the whole part of the Saxton analysis is to determine whether that role, whether that class of workers has a direct and necessary link with international or interstate transportation. Wouldn't you say that it would appear from Saxton that if the supervisor had... The evidence was she had seldom handled baggage physically, that the outcome would have been different. Likely not, Your Honor, because it still would be such a direct link to the actual transport of that cargo that really whether she is supervising it and controlling in that fashion or directly physically handling it herself, the distinction really doesn't serve a significant difference as far as determining whether this is someone who's an actor. You're suggesting that Saxton says it ruled the way it did because of her supervisory role in the chain of events on the bags. And that's not my understanding of what Saxton said. Saxton said she, in addition to her supervisory roles, she frequently touches and handles the bags. Isn't that what Saxton said? Saxton does say that, Your Honor. You're entirely right. The fact that she's a supervisor was irrelevant to the outcome in Saxton. I think that is correct, Your Honor. But I think it's also equally true that the fact that she's a supervisor is something that obviously the Supreme Court is comfortable with. It's not a problem that a role like a CSA can have some aspect of their actual work that isn't typically a part of transportation. Really here, though, the frequency analysis that was explored with the district court just proved how difficult it is to actually divorce any non-transportation related function of the CSA's roles with the transportation functions. Well, and we do need to have a limiting principle in this case. And I'm quite fond of Saxton because I suspect I'm the only person in this room today that was actually a ramp agent working my way through law school. And all I did was sling bags into the back of an airplane. But that's all I did. And, you know, to me, you know, Saxton and the supervisor that was watching me, he or she would frequently have to, you know, pick up the slack when we were behind schedule and the plane needed to leave. But upstairs in the terminal at the ticket agent, it seems the baggage handling is, you know, truly incidental to what their primary function is. And obviously, they need to get the customer tagged and the bag on the belt. But at least the frontier model is designed to minimize as much as possible the agent's participation in the process. The ultra low cost carrier model is, you know, you pay for everything and the customer does it. And, you know, to the extent customers can't cope with that, but the vision of frontier is that that would be a very small part of the CSA's job. So, okay, so if we are talking about frequency, then is it a, I mean, you know, how do you draw the line and how do we draw the line here on this record? Great question, Your Honor. Many cases have drawn lines where the actual involvement is just too attenuated with the actual flow of commerce or the actual flow of either cargo or passengers, where it just doesn't make sense that it is going to be too expansive and broadening the scope of the Section 1 exemption. For instance, at even an airport, there is a likelihood that certainly individuals that are so attenuated that even maybe just a surveillance component, that could be certainly a situation where that worker is just rather than being a direct link in the stream of commerce, they're actually above it. That they don't have a tangible or direct enough role where essentially their absence would affect transportation such that the exemption applies. That's one potential way. And any kind of regulatory sense of someone being involved in transportation, I think the question of how necessary that is, how much that is actually directly affecting whether transportation occurs, is going to be what's really significant as far as drawing the line in a workable way. Yeah, and we've talked about frequency, but at least one of the cases, I don't know if it was Singh or Fraga, talked about whether the movement of cargo would be a central part of the job. I guess I call that a centrality analysis. And I'm not quite sure how that differs from frequency, but can we say that moving bags is a central part of a CSA's job description, or is it something less? It is absolutely a central or essential part of CSA's positions. We have testimony that it occurred in 100% of their shifts, 100% of their shifts. We also have at both positions. And we also have testimony where certainly even the design, even what CSAs are trained to do, to work on that agent assist side where Ms. Joyner testified she works 50% of her time, they're trained to actually assist in actually helping the passenger fix their baggage or fix their luggage and also lift it as well. They're also conveying the actual cargo using the conveyor belt system. I know there's a discussion with Mr. Ward on whether that's actually the conveyor belts transporting. That would be similar to arguing that last mile drivers, that it's really the trucks delivering. We're talking about workers here, not equipment. Can I ask you? Oh, you go ahead, Judge. What does the evidence indicate with respect to these individuals in secondary if there was any evidence about CSAs generally? And that is how the conveyor belt ran. Was it a continuous belt or did they control the on-off switch? Great question, Your Honor. With respect to these plaintiffs specifically, they controlled the conveyor belt system by actually pushing a button after verifying that the cargo was set to the right location for that cargo to arrive at eventually its final destination after working through the baggage system and asked us- Was there evidence about CSAs generally in activating the belt? I don't recall it specifically in activating the belt itself, but there was evidence, certainly, that the court relied on in reaching its decision that other CSAs performed their actual work the exact way that the plaintiffs testified, that it was typical for everyone that would be a part of this class of workers. In the court making that finding, did it rely on the prototype type evidence or in the actuality evidence of other CSAs? Well, nothing- Was that clear, my question? I believe so, Your Honor. I think that the court relied on what the testimony reflected, the actual work was that other CSAs performed, and that that was corroborated by the fact that the system design encouraged or required every CSA to operate the conveyor belt system in the exact same way for it to function in actually effectuating transportation. Judge Bacow, if you want to- Well, I just had a question about something that you had just said, because I did not see it in Judge Crew's order. So, obviously, Menzies and Frontier argue about the trainer, that this is the way that the CSAs are trained, and you have the testimony in the declarations of Joyner, Dixon, and Hobley. What I never saw is something that you just said existed, and I probably overlooked it, but I never saw where Judge Crews actually said, I, Judge Crews, find, despite this discrepancy of evidence, that I believe that the way that Joyner, Dixon, and Hobley perform their jobs is representative of the way that other CSAs did their job in terms of the frequency that they hit the button to transport bags to the extent that they picked up bags, and I think you just said that he did make that finding, and I'm not quarreling with that. I just never saw that, and so that was a little bit of a difficulty for me, because we're not fact finders. Mm-hmm. Your Honor, in detailing with specifics what the role entailed and how that is enmeshed in transportation, there's just no way that you can divorce the actual specific role of these plaintiffs with what typical work would look like. No, no, I understand. The question is, what did the judge say? Yes. Did he say, these individuals are reflective of what happens actually generally? Did the judge so rule? I don't recall that expressed statement, Your Honor, but what I do recall is that there was an absence of any evidence to the contrary, for one, as well as- I mean, yeah, I mean, I have the same question as Judge Murphy. But I didn't mean to talk over you, by the way. But, you know, Menzies and Frontier present the evidence of the traitor that says exactly the opposite of what Joyner, Dixon, and Hobley say, and let's say, I mean, this is not summary judgment. And we're talking about whether or not the class of workers would constitute transportation workers. And so I just wonder, technically absent a specific finding from Judge Cruz that the way that these three- that he credited their testimony or declarations that the way that they were performing their jobs was representative of the class of workers generally, I just don't know how that we can say other than Joyner, Dixon, and Hobley were transportation workers. I don't know how we can say that about the transportation workers as a- I mean, about the CSAs as a class. You can see, Your Honor, in the fact that transportation does occur. And by how entwined, how intimately involved, this particular position has to be for that to happen. And I would urge the court to be reluctant on requiring at that stage in the proceedings at an evidentiary hearing evidence outside of the plaintiffs that would corroborate what the plaintiffs testified the actual work is that they're performing, particularly when it's so logically verifiable with the fact that transportation is occurring here. Do you have a case that doesn't say anything about the frequency? Well, the frequency aside, that says specifically if there is enmeshment in the transportation process, you are a transportation worker. Do you have a case that says that? Yes, Your Honor. I think Lopez from the Ninth Circuit is helpful on that front because that was actually, I believe, a Benzies employee, if I'm not mistaken. It was someone who fueled jet airplanes for the transportation of cargo. So it wasn't someone who ever directly handled the goods themselves or did anything as far as moving the goods in even a really short aspect in the stream of commerce. They just were so enmeshed with fueling the airplanes that did perform the transportation that they really couldn't be divorced from having that direct and necessary link that Saxon requires. All right. I think your time's expired. Thank you. Five minutes ago. We'll give Mr. Ward three minutes. Very grateful for the extra time, Your Honor. I want to pick up on Judge Bacharach's question about what did Judge Cruz say? This is what he said at the hearing because we started to try to present evidence that was contradictory to what the plaintiffs were saying. And he says, hold on. The issue before the court is what these plaintiffs actually do with their work. That's wrong. That's not Saxon. It doesn't matter what the plaintiffs do. It's what the class of workers does. He then went on to say, if other employees were doing it differently, I don't find that persuasive of anything that I need to decide. That's wrong. And then in his order, this is what he wrote. Interstate transportation of goods is enmeshed in the work performed by these plaintiffs, and it is difficult to divorce them. The court finds Ms. Joyner, Ms. Dixon, and Ms. Hobley are transportation workers. That is a wrong finding as a matter of law because what he is not saying is the class of workers are transportation workers. He never said that. He evaluated everything in this case solely through the lens of the plaintiffs, and that is simply a misapplication of the Saxon test. Would that be harmless error on this record, though? Not when we offered the evidence to try to show it's otherwise there. I mean, at minimum, this should be remanded for the judge to evaluate the evidence under the proper legal standard. That's the starting point. My point is, I think this record is sufficient to not say this is harmless error. In fact, Judge Cruz got it wrong. And you asked where this is in the record. It comes in three places. One is objective evidence. We put videos in there. This is what they do. 20 minutes of video footage. Videos of actual workers. Videos of actual workers working the backdrop. There's 20 minutes of video. That's not helpful. That's like a snapshot. That's like a poll. It's 20 minutes of footage, and it's useful for the 20 minutes, I would say, Your Honor. Like, does that show what they do? You know, Ms. Shelby referred to, the plaintiff said, 100% of the shifts. Okay, that may be accurate, but if you spend three minutes of every shift doing it, that's not frequent. That is hyperbolic exaggeration, and that's what the plaintiff said. And to your question— We can look at the record. Do you say there are no cases that rule that embezzlement is enough? That is a complete invention by the district court. So you're saying there are no cases other than the district court ruling here. Not just em— Saying embezzlement makes you a transportation worker. There is no case that says embezzlement. There is no case that says gatekeeping. There is no case— Does it say any integral? That, Saxon says, directly involved.  And this is, Ms. Woods made the point that she said— Well, Saxon says a role in the flow of goods. A direct and necessary role. Direct, necessary, as measured by actual physical involvement. These are words from Saxon. I think the word physical from Saxon is critical. It talks about this idea that you've got to be transporting the goods. Other than the plaintiff in Lopez, who didn't transport anything. And that's my case, Your Honor. I argued it at the Ninth Circuit. I'll be candid. I think the Ninth Circuit got it wrong. But even they didn't say embezzlement. They invented a different text. Well, yeah. I mean, yeah, they didn't use the word embezzlement. But the Ninth Circuit said also the opposite of what you just said. And that is that the Ninth Circuit unanimous panel found that the person that fuels the plane, albeit doesn't transport anything, is a transportation worker. Because he or she is directly involved in the machinery, like the conveyor belt, that transports goods across state lines. And even then, I can still distinguish Lopez, Your Honor. I disagree with the Ninth Circuit. The test they created was a vital component. I don't know what that means, especially when you read it against Circuit City. Because that is massively expansive when Circuit City says this is narrow. But at minimum, the fuelers in Lopez, that's all they did. They fueled aircraft 100% of their time, 100% of their shifts. So even if you compare this case to that case, frequency is satisfied there. It is not satisfied here. Okay. I'm very appreciative of the extra time, Your Honor. Thank you very much. Thank you, counsel. Appreciate the arguments. That was very helpful. You're both excused. The case shall be submitted.